UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff,*<br><br>    v.<br><br>OLEG KOSHKIN,<br><br>    *Defendant*. | No. 3:19-cr-00251 (MPS) |

## RULING ON MOTION TO SUPPRESS POST-ARREST STATEMENTS

## I.   INTRODUCTION

Oleg Koshkin, a native Russian and the defendant in this computer crimes case, has moved to suppress his post-arrest statements to the Federal Bureau of Investigation ("FBI"), arguing that his Fifth Amendment rights were violated because he was not orally told in Russian what his rights were and because there is insufficient proof that he understood his rights.  After reviewing the audio recording of the relevant portion of the interview, hearing the testimony of Koshkin, the Russian-English interpreter present at the interview, and another Russian-English interpreter, and reviewing the parties' submissions and the exhibits admitted into evidence at the suppression hearing, I find that Koshkin knowingly and voluntarily waived his *Miranda* rights. The post-arrest statements are therefore admissible and Koshkin's motion to suppress, ECF No. 36, is DENIED.

## II.   FACTUAL FINDINGS

Koshkin, who was arrested in September 2019 and indicted a month later for computer-related crimes involving the alleged use of malware, filed a motion to suppress statements he made during his post-arrest interview, and the Government filed a memorandum in opposition.

ECF No. 36, ECF No. 37.  After reviewing the briefs and exhibits related to the motion to suppress, I concluded that an evidentiary hearing was necessary. ECF No. 41.  The hearing took place on January 14, 2021, and was conducted via Zoom with the consent of the parties. Transcript at 1, 10-11 (ECF No. 55, hereinafter "Tr.").  The Government offered the testimony of the FBI interpreter who was present at the interview, tr. at 12, and defense counsel offered the testimony of Koshkin and another Russian interpreter. Tr. at 64, 110.  Based on the evidence presented at the hearing, I make the following factual findings by a preponderance of the evidence.

### A.  Arrest

At approximately 7:00am on September 6, 2019, Oleg Koshkin was arrested in Berkeley, California, on a complaint for conspiracy to cause damage to a protected computer and for aiding and abetting the intentional causing of damage to a protected computer using an encryption service called Crypt4U. ECF No. 1 at 1, ECF No. 1-1 at 5; ECF No. 36-1 at 1.  Koshkin was transported to the Berkeley Police Department for a post-arrest interview conducted by FBI Special Agent Michael Morrison. ECF No. 36-1 at 1, ECF No. 37 at 1.  Also present at the interview were FBI Operations Specialist Jessica Lapinsky, and Zurab Charkviani, an FBI language specialist and Russian-language interpreter. ECF No. 36-1 at 1, ECF No. 37 at 1-2. The interview was audio recorded and a "verbatim translation" of the first three minutes of the interview was prepared and is attached to this ruling as Exhibit A.  ECF No. 36-1 at 1, ECF No. 37 at 2, Exhibit 4.  The translation was prepared by FBI Language Specialist Margarita Alperovich in New Haven on September 15, 2020 and reviewed by another FBI employee, Luba Voronin. ECF No. 37-1 at 1, Exhibit A at A1.  Charkviani testified credibly that the translation is an accurate recitation of the audio recording, and Koshkin has not contested this, except to

dispute the level of precision in translating one word from Russian to English, a point I discuss further below. Tr. at 25.

**B. Events Leading up to the Arrest**

Koshkin was born in Russia and lived there until he was 25 years old. Tr. at 69-70.  As part of his education in Russia, Koshkin studied English for four or five years before attending college for six years and receiving a degree in finance. Tr. at 87, 96.  In college, Koshkin took one business course that involved some English. Tr. at 96, 103.  He described his ability to understand English at the time he was arrested as "limited." Tr. at 73.

On cross-examination, however, Koshkin admitted to having substantial communications in English.  Specifically, when Koshkin left Russia, he moved to Estonia, during which time he spent the winters, typically three to five months each year, in Thailand. Tr. at 89.  He had relationships with two Thai women, Sunisa and Narinda, and communicated with both of them in English, albeit "low level English" according to Koshkin "because very often I didn't understand them and very often they didn't understand me." Tr. at 89-91, 101-02.  Koshkin's relationship with Narinda lasted "three years, maybe longer," and Koshkin admits that he lived with her for part of the winter months while they were together and had "substantial communications" in English with her during their relationship. Tr. at 91, 96-97.

Koshkin testified that he had never been arrested or questioned by police in Russia, was not familiar with any rights that criminal defendants have in Russia, did not become familiar with any rights criminal defendants have in Estonia, and never studied or learned the rights that American criminal defendants have. Tr. at 69-70.  On cross-examination, the Government reminded Koshkin that it "has your phones and chat transcripts and a lot of information.  So I'd ask you to think back about whether you've had any interactions with the police prior to your

arrest in the United States." Tr. at 84.  Koshkin then admitted that he had been pulled over by police while driving in Russia, Europe, and Asia before his arrest in the United States. Tr. at 85. On re-direct, Koshkin stated that he was stopped "[m]ostly to check [his] papers, [his] ID driver's license…. Mostly it was just a regular document check." Tr. at 106.

In the beginning of August 2019, Koshkin came to the United States to study English. Tr. at 81, 97.  He enrolled in an English language course that lasted approximately three hours per day for four weeks and testified that he performed at "average level" in the course. Tr. at 81. Koshkin testified that to get by with low-level English skills while living in the United States, he mostly stayed in the hotel, went to class, went shopping, and did things that did not require extensive knowledge of English. Tr. at 105.  On re-cross, the Government inquired about that testimony, at which point Koshkin qualified his statement by adding that he had also left the hotel to go on a class group trip to "Angel's Island" twice. Tr. at 108.   It was on the last day of the four-week English class that Koshkin was arrested. Tr. at 87-88.

### C.  The Arrest and Interview

When the police arrived to arrest Koshkin, he had been sleeping for four hours, as far as he remembers. Tr. at 65.  Three police officers knocked on his door, he opened the door, and a female police officer began speaking in English. Tr. at 65.  There was no interpreter present at that time and Koshkin testified that he did not understand what the officers were telling him. Tr. at 65-66.  The officers handed Koshkin his clothes, turned him to face the wall, placed him in handcuffs, and transported him via car to the police station. Tr. at 66-67.  The police did not engage Koshkin in any conversation in English or Russian until they arrived at the interview room. Tr. at 71.

The interview room was a "small" windowless room that contained a table. Tr. at 72.

Koshkin testified that he sat handcuffed on one side of the table, Charkviani, the FBI interpreter, sat on the opposite side, and Agent Morrison sat to Koshkin's left, at the end of the table. Tr. at 72.  According to Koshkin, it would have been "impossible for two people to be on the opposite side of this table." Tr. at 72.  Charkviani described the table as "a standard office desk, two [feet] by four [feet] I think." Tr. at 52.  Operations Specialist Lapinsky was also in the room, apparently at the opposite corner of the room from Agent Morrison. Tr. at 72.  Charkviani asked Koshkin in Russian if he needed an interpreter, to which Koshkin responded "yes, I need an interpreter." Tr. at 72.

The audio recording of the interview began and Koshkin recalls Agent Morrison placing a piece of paper on the table between himself and Agent Morrison. Tr. at 73-74.  The parties do not dispute that the one-page paper was a Russian translation of the "FBI Advice of Rights" form. ECF Nos. 36-4 at 1, 36-5 at 1, Exhibit 2.  The English advice of rights form is divided into four sections: (i) Location; (ii) Your Rights; (iii) Consent; and (iv) Witnesses. ECF No. 36-4, Exhibit 1.  The Russian version is also divided into four sections and looks to have the same overall structure and length of content as the English form. ECF No. 36-5, Exhibit 2.  Koshkin testified on cross-examination that he was not able to see the Russian form from where he was sitting "[b]ecause it was not exactly close to me." Tr. at 92.  The Government asked, "Could you see the text at all?" to which Koshkin replied "No." Tr. at 92.

I do not find Koshkin's testimony that he could not see the text "at all" credible.  By his own account, the room was "small," and it would have been "impossible" for two people to sit at the table opposite him, suggesting, as Charkviani testified, that the table was also small.  It is thus unlikely that if the paper was placed on what Charkviani described as a two foot by four foot "standard office desk," Tr. at 51, and in a location "between [Koskin] and the agent," as

Koshkin acknowledged, Tr. at 74, that Koshkin was unable to see the text at all.  The audio

recording is also consistent with Charkviani's more credible testimony that the Russian form was

placed in front of Koshkin and that Koshkin was looking at the form. Tr. at 17-18.

[timestamp 0:02]
> SA: [English] [background noise] Special Agent Michael Morrison. I am here with
> Jessica Lapinsky uhm and…Zurab, I am sorry, I don't know [PH] your last name.
>
> Interpreter: [UI]
>
> SA: Here we go Charkviani with the FBI. We are here speaking with Oleg hmm about
> [PH] to advise him of his rights. So it's currently nine six, twenty nineteen…[background
> noise] twenty nineteen…at uhm seven forty-one AM. Uhm *you got a Russian version of
> this in front of you*. *I am just going to read the English version of the same*, what I believe
> the same words [OV]

[timestamp 00:36]
> Interpreter: --[Russian] *That is … in English* [OV]
>
> Oleg: -- *OK.*
>
> Interpreter: --[Russian] English translation of the same.

ECF No. 37-1 at 4, Exhibit A at A4 (emphasis added).

It is difficult to understand, as the Government pointed out on cross-examination, why

Agent Morrison would have gone to the trouble of obtaining the Russian form and putting it on

the table, only to place it so that Koshkin could not see it.  It is also difficult to understand why

Agent Morrison would lie in the course of the interview when he said that the Russian version of

the form was in front of Koshkin or why Koshkin would say "OK", if in fact he could not see the

Russian version, when he was being told that the piece of paper from which Agent Morrison was

reading was "in English" and an "English translation of the same."

On direct examination, Koshkin was asked "Do you remember the interpreter telling you

in Russian that English translation of the same in Russian?"  Koshkin responded "Yes, I do

remember."  Tr. at 75.  When asked what he understood the translator was referring to, Koshkin

responded "I do not know." Tr. at 76.  The Court also asked Koshkin what he meant when he

said OK.  The following exchange ensued:

A: That is most likely not a meaning but a continuation….In Russian when somebody is
speaking to you and you are kind of supporting the conversation, then very often we say [sic] in
agreement.

THE COURT: I see.  And when you said that, did that mean that you understood what the
interpret[er] was saying to you, when he said that is in English or not?

A: I didn't pay attention to that.  I was expecting simply the next text.

THE COURT: Okay.  So even though you express some agreement, as I understand it, in
Russian, are you saying now that you weren't paying attention to what you were agreeing with?

A: Most likely.

Tr. at 98-99.  I do not find credible Koshkin's account that he expressed agreement by saying

"OK"—in English—even though, according to him, he was not paying attention, and could not

see the document at all.  I find it more credible, and consistent with the recording and

Charkviani's testimony, that Koshkin had the Russian form close enough in front of him to see

the writing.  Further, there is no dispute that Koshkin could read Russian; he graduated from

college in Russia and expressly admitted during cross-examination that he is able to read

Russian. Tr. at 87.

At that point in the interview, with the Russian advice of rights form in front of Koshkin,

Agent Morrison began to advise Koshkin of his rights in English as follows:

[timestamp 00:39]
       SA: [English] Uhm so, before we ask you any questions, you must understand your
       rights. Uhm you have the right to remain silent. You do not have to talk to us right now if
       you don't want to. Uhm anything you say can be used against you in court. You have the
       right to talk to a lawyer for advice before we ask you any questions. You have the right to
       have a lawyer with you during the questioning. If you cannot afford a lawyer, one will be
       appointed uhm for you before any questioning if you wish. And if you decide to answer
       questions now without a lawyer present, you have the right to stop answering at any time.
       But if you want a chance right now to give us your side of the story, this is your
       opportunity. Is this what you would like? [OV]

[timestamp 01:13]

[timestamp 01:14]

> Interpreter: [Russian] – That is [PH], do you understand your rights, correct? [OV]
>
> Oleg: -- Uh-huh [OV]
>
> Interpreter: [Russian] – Now it is an opportunity for you to express your opinion about what has been happening and what had been happening, to tell your version of the story.

ECF No. 37-1 at 4-5, Exhibit A at A4-A5.

Charkviani testified that while Agent Morrison was reading Koshkin his rights in English, Koshkin "was looking at the document in front of him…. He was looking intent – as far as I can remember, he was looking intently at the document and making head moves consistent with reading top to bottom left to right." Tr. at 18-19.  When the Government asked why he did not translate the *Miranda* warnings after they had been read by Agent Morrison, Charkviani testified:

> I thought that since the defendant had a document in Russian in front of him, it would make it easier for him, instead of listening to the Special Agent Morrison and me providing simultaneous interpretation and trying to read the document, it would be easier for him to listen to the agent and then read the document at his own pace, take as much time as he needs.

Tr. at 18-19.  Charkviani's decision not to translate Agent Morrison's verbal advice of rights may not have been the most prudent; perhaps it would have been a better practice to translate each right as Agent Morrison stated them verbally.  That choice, however, does not affect my assessment of Charkviani's credibility.  He was forthcoming about his choice and had a plausible explanation as to why he proceeded in that fashion.  I found him to be a credible witness.

I also credit Charkviani's testimony that he was under the impression that Koshkin understood his rights.  He testified that Koshskin's response, "Uh-huh" after being asked "do you understand your rights, correct?" was accompanied by Koshkin's nodding his head. Tr. at 29.

He elaborated that, for a native Russian speaker, "uh-huh" is "a verbal form of acknowledgment, agreement, understanding … basically a form of yes." Tr. at 30.  Koshkin, on the other hand, testified that during the time that Agent Morrison was speaking in English, he was looking at Agent Morrison, but did not try to listen and did not try to understand what was being said because he "knew that the text [was] going to be translated." Tr. at 74-75.  Koshkin disputes that he said "Uh-huh," testifying that he said "hmm-hmm" instead. Tr. at 76-77.  He had no explanation as to what he meant by "hmm-hmm," and "hmm-hmm" is not reflected anywhere in the "verbatim translation" of the audio recording. The following exchange took place on direct-examination:

Q: Do you recall the interpreter asking you if you understood your rights in Russian?

A: Yes, I remember that question.

Q: What did you understand that he was asking you about at that time?

A: I did not understand what he was asking me.

Q: You responded to that question with a uh-huh; correct?

A: I said hmm-hmm.

Q: And what did you mean by hmm-hmm?

A: I don't know. It was my reaction.

Tr. at 76-77.

Another indication that Koshkin was paying attention and understood at least some of what Agent Morrison was saying in English is that Koshkin responded to a complex question in English.  After reading Koshkin his rights, Agent Morrison asked him in English, "Do you want to talk to us now and answer questions and tell us about crypt4u?" ECF No. 37-1 at 5, Exhibit A at A5.  Koshkin did not wait for the question to be translated, but rather, bypassed the interpreter

and responded, in English, "Okay, I can talk." *Id.* When asked about this exchange on direct examination, Koshkin testified that he understood that he *had* to talk about Crypt4U because he had been asked about it "by a representative of authority." Tr. at 77.  Koshkin's explanation, that he understood he was obligated to talk, is inconsistent with the way in which the question was posed, Do you *want* to talk, and the way in which Koshkin responded, Okay, I *can* talk. Koshkin's use of "can" in response to "want" suggests willingness, not obligation.  This exchange also undermines the credibility of Koshkin's testimony that he was not paying attention, was not trying to understand, and did not understand what was being said.

After Koshkin said, "Okay, I can talk" in English, Agent Morrison asked Koshkin to sign the Russian form.  Agent Morrison stated during the interview:

[timestamp 01:38]
    SA: [English] Okay, but I just…want to ask you to sign your name there…that uh [OV]

[timestamp 01:42]

[timestamp 01:43]

    Interpreter: [Russian] Sign that, that you read it.

ECF No. 37-1 at 5, Exhibit A at A5.

The parties dispute the translation from the Russian word spoken in the audio recording to the English word "read" at timestamp 01:43 in the verbatim translation.  Mr. Tetradze, a professionally qualified Russian-English interpreter, who has been certified for interpretation by the U.S. Courts and also performs contract work for the U.S. Department of State, testified that the proper translation of the audio recording is "Sign that, that you have *familiarized yourself*," not "that you have *read* it." Tr. at 111, 114.  Under that interpretation, Koshkin was not signing because he had read the form but was doing so because he had familiarized himself with it. Charkviani offered a somewhat different interpretation, although he agreed that the literal

translation of the Russian word was "familiarize" rather than "read."   He testified that the word in the audio recording is "a versatile word which has – which can have [a] number of translations depending on the context." T. at 32-33.  The following exchange took place at the hearing:

Q: Okay. How would you translate that word standing along?

A: Familiarize myself.

Q: Okay. What about in the context where a written form is involved?

A: … [T]he core meaning of the word is a process of acquiring knowledge about some subject.… I familiarize myself, and now I know something about it.  Now, that knowledge can be gotten a number of ways verbally by picture by reading the document. In this particular case, that knowledge was acquired by reading document.  So it can be translated as I have read.

Q: Okay. So how would you translate it in this context?

A: I have read.

Tr. at 33.

Koshkin denies having read the Russian advice of rights form.  He testified that he "did not read that piece of paper" because he "assumed that this is just a mere formality and the only thing that they would require from me is just a signature." Tr. at 78.  Koshkin's explanation is implausible because, even if Tetradze's translation of the Russian word for "familiarize" is credited, Koshkin was told in Russian to sign indicating that he had familiarized himself with his rights, and he signed his name.  At the hearing, he admitted he signed the document and identified his signature.[1]

---

[1] There were several inconsistencies in Koshkin's explanation for his decision to sign the form, which made the explanation, as a whole, implausible.  First, Koshkin admitted that he understood that signing the document meant that he had familiarized himself with it.  Tr. at 78 ("After that, the agent began saying something, and then they pushed this piece of paper in front of and the interpreter said to me in Russian, sign this to confirm that you familiarized yourself with it.").  Almost in the next breath, however, he claimed that he had not read the document before signing it because he "assumed that it was just a mere formality." Tr. at 79.  This was during direct examination.  On redirect examination, he claimed, for the first time, that he did not "feel [he] had the ability to refuse to sign." Tr. at 104.  That casts the scene in a different, more coercive light than his earlier testimony that he thought his signature

Koshkin's testimony that he did not read the form is also implausible because he asked Charkviani a question about one of the headings on the form immediately after Charkviani translated Agent Morrison's request that Koshkin sign the form:

[timestamp 01:38]
    SA: [English] Ok, but I just … want to ask you to sign your name there … that uh
[timestamp 01:42]

[timestamp 01:43]
    Interpreter: [Russian] Sign that, that you read it.
[timestamp 01:44]

[timestamp 01:45]
    Oleg: [Russian] But what does it mean refusal of rights?

ECF No. 37-1 at 6, Exhibit A at A6. The "refusal of rights" that Koshkin was referring to is the third heading on the Russian advice of rights form; the words are in large type and boldface, and the phrase is highlighted in gray. Tr. at 78-79, Exhibit 2. The fact that Koshkin asked about the heading, rather than immediately signing as if believing he had to do so, undermines his testimony that he signed because he had been instructed to do so by someone in authority. His question also confirms he read at least some of the words on the form.

When Koshkin asked Charkviani, "what does it mean refusal of rights?", Charkviani interpreted the question into English for Agent Morrison and the following exchange took place:

[timestamp 01:48]
    Interpreter: [English] What does it mean re-refusal of right?

    SA: [English] So it should say I read the statement of my rights and I understand what my rights are and at this time I am willing to answer questions without a lawyer present.

[timestamp 02:00]

---

was a "mere formality." Further, it is not consistent with his raising the question "But what does it mean 'refusal of rights'?" when the translator asked him to sign the document. If he felt he had no choice but to sign, why, when told by the translator, "Sign that, that you [familiarized yourself with] it," did he ask, "But what does it mean 'refusal of rights'?" The question and its timing do not reflect an atmosphere of coercion.

[timestamp 02:01]
      Interpreter: [Russian] That is [OV]

      SA: [English] –This does not…

      Interpreter: [Russian] This, this is [English] wrong, wrong translation.

      Interpreter: [Russian] This means that your read your, your rights. You are not refusing. Nobody takes away your rights. It means you[] have read it. It is written here: I read my…my rights…

      Oleg: Uhm [OV]

[timestamp 02:16]

[timestamp 02:17]
      SA: -- [English] You, you don't give up your rights…[background noise] You can stop talking at any time. [OV]

      Interpreter: --[English] [UI] time, if you want [PH]

[timestamp 02:19]

[timestamp 02:20]
      Oleg: -- [English] Uh-huh translate incorrect [PH]
      [background noise]
      Interpreter: [Russian] Yes, [UI]

ECF No. 37-1 at 6-7, Exhibit A at A6-A7.

According to Charkviani, this exchange concerned the interpretation of the third heading on the Russian form.  On the English form, the heading is "Consent," and when Agent Morrison explained what the heading should mean, Charkviani believed the translation of "Consent" was not correct on the Russian form. Charkviani testified that the word on the Russian form translates as "refusal of rights," which would be an incorrect translation of the word "Consent". T. at 30, Exhibits 1, 2.  Charkviani testified that he "discussed at length" the "error in translation" and that Koshkin understood that "he's not giving up any of his rights, he agreed that it was just a matter of translation…." Tr. at 32.

When asked what he understood by Charkviani's explanation, Koshkin testified, "Just the mere formality. I did not know what the document was.… At that point in time, I did not know what my rights were.…  I did not read the words under the caption, I just read that caption itself." Tr. at 80-81.  This explanation is inconsistent.  Was it that Koshkin did not know what the document was, or that he thought it did not mean anything—a formality, or that he thought he had to sign it, or that he knew the document had something to do with rights but did not know what his rights were?  In any event, at that point Koshkin signed the document. Tr. at 81.

On cross-examination, the Government inquired about whether Koshkin read the form when he signed it.  The following exchange took place at the hearing:

Q: Before you signed the document, it was close enough to you for you to read it; right?

A: When I was asked to sign this document, it was moved towards me so that I could sign it.

Q: At that point, at least at that point you would have been able to read the document; right?

A: Well, what I immediately saw with my eyes was the phrase that was in the center that was in capital letters, and I immediately had a question about that.

Q: So it's your claim that you had a question about three words on that page, but you didn't read any of the other words on that page.  Is that your testimony?

A: I'm sorry, but I have trouble with the connection, and I do not hear the ending of what the interpreter is saying.  Could you please repeat that question?

Q: So you're testifying that you read those three words on the page but none of the other words on the page; right?

A: Yes, that is correct.

Tr. at 94.  I do not find Koshkin's claim that he read no other parts of the form to be credible.  Given that Koshkin asked the question about "refusal of rights" immediately after he was asked to sign the form, and that he then signed the form, it is difficult to believe that he did not also read at least the language that appears immediately below the "refusal of rights" heading and

immediately above the signature line on which he placed his signature.  The English translation

of that language states, "I have read this statement of my rights and I understand what my rights

are.  At this time, I am willing to answer questions without a lawyer present."  ECF No. 36-5 at

1, Exhibit 2.

Charkviani also testified about his perception of Koshkin's level of proficiency in

English.  According to Charkviani, the entire interview lasted between three and a half to four

and a half hours (the "verbatim transcript" quoted above covers only the portion of the interview

involving the reading of rights), and over the course of the interview, there were "a number of

moments … where the defendant would react in response to a question asked by Agent Morrison

before I even would offer interpretation.  There were a number of instances throughout the

interview where the defendant would engage in[] basic [English] conversation with [] [A]gent

Morrison." Tr. at 36. He testified that he believes Koshkin has a "basic understanding of the

English, basic command of English language." Tr. at 36.  I find Charkviani's testimony credible

in light of the evidence of Koshkin's training in English, his involvement in relationships with

two Thai women with whom he communicated only in English, and his answering an English

question in English without intervening translation during the brief three-minute audio recording

at issue in this ruling, namely, "Okay, I can talk."

## III.    LEGAL STANDARD

Under *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), statements made during a custodial

interrogation may not be used by the prosecution "unless the suspect (1) has been apprised of his

Fifth Amendment rights, and (2) knowingly, intelligently, and voluntarily waives those rights."

*United States v. Oehne*, 698 F.3d 119, 122 (2d Cir. 2012) (citing *Miranda*, 384 U.S. at 444-45).

When an individual is questioned in police custody, "[h]e must be warned prior to any

questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). "[C]ourts must presume that a defendant did not waive his [*Miranda*] rights." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). Therefore, to establish that a defendant validly waived his *Miranda* rights, the Government must prove by a preponderance of the evidence "(1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving the right." *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995). Courts assessing whether a defendant has knowingly and voluntarily waived his *Miranda* rights must consider the totality of the circumstances. *Fare v. Michael C.*, 442 U.S. 707, 724-25 (1979).

It is also "well settled in the Second Circuit that the existence of limitations on English language skills does not preclude a defendant from knowingly and voluntarily waiving his or her *Miranda* rights." *United States v. Jabu*, No. 12-CR-454 KAM, 2012 WL 5389937, at *5 (E.D.N.Y. Nov. 5, 2012) (collecting cases and citing *Jaswal*, 47 F.3d at 542). When assessing the voluntariness of the waiver, courts consider "(1) the characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of the law enforcement officials." *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir. 1988). Characteristics can include experience, background, age, education, and intelligence. *Id.* at 902.

## IV.   DISCUSSION

Koshkin argues that his post-arrest statements should be suppressed on two grounds: (1) he did not have a reasonably good command of the English language so could not have knowingly and voluntarily waived his rights; and (2) he was not adequately advised of his rights

prior to questioning because, although the advice of rights form was in Russian, the interpreter did not verbally advise Koshkin of his rights in Russian and there is no indication that Koshkin read the Russian form. ECF No. 36-1 at 4, 6.  I conclude, based on the totality of the circumstances, that the Government has proven that Koshkin understood his rights and knowingly and voluntarily waived those rights.  The credible testimony of Charkviani, the audio recording, and the testimony of Koshkin himself establish that Koshkin has a reasonably good command of the English language, and that he read, acknowledged, and signed the Russian advice of rights form understanding that doing so meant that he was agreeing to speak to the FBI without a lawyer present.

A waiver of rights can be knowing and voluntary, even if there are language barriers, if the defendant has a reasonably good command of the English language. *See Jaswal*, 47 F.3d at 542 (affirming district court's conclusion that waiver was knowingly and voluntarily given based, in part, on a finding that the defendants had a "reasonably good command of the English language"); *see also Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989) (finding "unpersuasive" the claim that "because of his poor grasp of English and the confusing circumstances surrounding the questioning, [Campaneria] did not understand the *Miranda* warnings.").

The Governments has offered ample evidence to meet its burden to prove that Koshkin had a reasonably good command of the English language.  Koshkin had "substantial communications" over several years, exclusively in English, with two female partners, one of whom he lived with for part of the time over the course of three winters while they were together in Thailand. Tr. at 91, 97.  Koshkin also studied English—in grammar school in Russia, in a college course in Russia, and at a four-week program that he had just completed while living in

the United States. Tr. at 87, 88, 96.  This evidence indicates not only that Koshkin had a reasonably good command of English, but that he is educated, intelligent, and has traveled the word, all factors I consider when evaluating voluntariness. *Green*, 850 F.2d at 902.

Further, Koshkin demonstrated during the interview and on the audio recording that he could communicate in English.  Charkviani testified credibly that Koshkin responded to questions during the interview and engaged in basic conversation with Agent Morrison—all without interpretation. Tr. at 35.  That testimony is supported by the portion of the interview captured on the audio recording, in which Koshkin responded to Agent Morrison in English—without interpretation.  Specifically, Agent Morrison asked Koshkin, in English and without interpretation, if he wanted to talk and answer questions. ECF No. 37-1 at 5, Exhibit A at A5. Koshkin responded, in English, "Okay, I can talk." *Id.*  Koshkin's response that he could talk also suggests that he was paying attention to Agent Morrison and undermines Koshkin's testimony that he "did not pay attention", did not understand, and was simply waiting for the translation. Tr. at 99.

Koshkin described his ability to understand verbal English at the time of the interview as "limited." Tr. at 73.  I find that this vague description is something of an understatement, but even if I credited his testimony as to his actual level of proficiency,  limited English-language ability can suffice to make a knowing and voluntary waiver. *Campaneria*, 891 F.2d at 1020 ("Even though his proficiency in the English language may have been *limited*, it did not prevent him from making a knowing and intelligent waiver of his constitutional rights.") (emphasis added).

Koshkin argues that he relied on the translator because of his limited English and the translator "failed to translate … what [Agent] Morrison said about his right to an attorney during

questioning and waiving that right waiver, and misinform[ed] Mr. Koshkin as to what the section states." ECF No. 36-1 at 6.  The translation was not verbatim, and it was not perfect; but it need not have been as long the defendant indicated that he understood his rights and answered questions. *See United States v. Guzman*, No. 13-cr-6118, 2015 WL 774211, at *12 (W.D.N.Y. Feb. 24, 2015) ("That [officer] did not read the second waiver question in Spanish does not warrant suppression of [defendant's] statements because [defendant] indicated that he understood his rights and answered the officers' questions.") (collecting cases).  Koshkin indicated he understood his rights and was willing to answer questions when he responded directly to Agent Morrson's untranslated English-language question about whether he wanted to talk with the English-language answer, "Okay, I can talk."

Koshkin also argues that if the defendant does not have "a command of the English language then the rights must be provided in a language the person can understand." ECF No. 36-1 at 5.  I understand Koshkin to be arguing that the rights must be provided *orally* in a language the person can understand, since it is undisputed that Koshkin was shown a Russian-language statement of his rights.  Koshkin does not cite any cases to support the proposition than an oral recitation of rights in a familiar language is required, and I disagree with his suggestion that any particular form of communication "must" be provided, because "[t]he question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case" based on the totality of the circumstances. *Butler*, 441 U.S. at 373.  As noted, Koshkin was provided his rights in a language he could understand, the advice of rights form in Russian.

"In general, a suspect who reads, acknowledges, and signs an advice of rights form before making a statement has knowingly and voluntarily waived *Miranda* rights." *United States*

*v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) (internal quotation marks and citation omitted). The Government has proven by a preponderance of the evidence that Koshkin read, understood, and signed the advice of rights form.  The Russian form was placed on a small table in front of Koshkin and he looked intently at the document and made head movements top to bottom and left to right, consistent with reading, at the same time that Agent Morrison read the English version of the form out loud. Tr. at 19.  There is no doubt that Koshkin can read Russian – he admitted as much and has a college degree from Russia. Tr. at 87.  Charkviani also told Koshkin that the form in front of him was the Russian version of what Agent Morrison was reading in English, to which Koshkin responded, "OK"—again in English. ECF No. 37-1 at 4, Exhibit A at A4.  As discussed above, I do not credit Koshkin's testimony that at first he could not see the document at all and that, later, when he was asked to sign and the document was pushed in front of him, he only read the three-word caption and nothing else on the page.

Koshkin and Charkviani discussed Koshkin's question about the caption, and Charkviani told Koshkin to sign to acknowledge that he had familiarized himself with the form. Specifically, Charkviani explained, in Russian, "This means that you[] [familiarized yourself with] your, your rights.  You are not refusing.  Nobody takes away your rights.  It means you have [familiarized yourself with] it.  It is written here: I [familiarized myself with] my … *my rights* …" ECF No. 37-1 at 6, Exhibit A at A6 (emphasis added).  Koshkin signed the form.

The fact that Koshkin signed the form, after being told that signing meant he was "familiar with his rights", although not dispositive, is another indication that he understood his rights and waived them. *See United States v. Lynch*, 92 F.3d 62, 65 (2d Cir. 1996) (describing the signing of the waiver of rights as one indication that the district court correctly found that the defendant knowingly and voluntarily waived his constitutional rights); *see also United States v.*

*Corbett*, 762 F. Supp. 2d 428, 434 (D. Conn. 2011) (same) (citing *Butler*, 441 U.S. at 373 ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but it is not inevitably either necessary or sufficient to establish waiver.")).

This evidence, taken together, suggests that Koshkin had all the tools at his disposal to understand his rights and to understand that he was waiving them by agreeing to speak to the FBI.  He understood English, even if his English-language ability was "limited," he had before him an advice of rights form in his native language, and he had an interpreter of whom he could – and did – ask questions.  And although Koskin asked about what "refusal of rights" meant on the Russian form, at no point did he ask any other questions or otherwise indicate that he did not understand the *Miranda* warnings that were read to him or that he did not understand the rights set forth on the Russian form.  *See United States v. Jabu*, No. 12-CR-454 KAM, 2012 WL 5389937, at *6 (E.D.N.Y. Nov. 5, 2012) ("[W]here, as here, a defendant does not indicate that he does not understand the Miranda warning read to him in English and also exhibits no difficulty in understanding what officers speaking only English are saying, courts in this Circuit have found valid waivers despite the presence of some English-language limitations.").

The totality of the circumstances shows that Koshkin knowingly and voluntarily waived his rights—he listened to his rights verbally in English, he followed along and read his rights in Russian, and less than a minute later, he said in English in response to an English-language question about whether he wanted to talk, "Okay, I can talk."  He then asked the interpreter to clarify one heading on the Russian form and acknowledged that he had familiarized himself with his rights by signing the form.

## V.       CONCLUSION

For the foregoing reasons, Mr. Koshkin's motion to suppress (ECF Nos. 36) is DENIED.


IT IS SO ORDERED.


_____/s/_____
Michael P. Shea, U.S.D.J.


Dated:          Hartford, Connecticut
                January 27, 2021

# **<u>EXHIBIT A</u>**

UNCLASSIFIED//FOUO

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**



FBI New Haven
600 State Street, New Haven, CT 06511

File Number:

Requesting Official(s) and Office(s):  SA Michael Morrison, NH, CT

Task Number(s) and Request ID:  Task No. 1222275 , Request No. 1219766

Date Completed:  9/15/2020

Name and Office of Linguist(s):  LS Margarita Alperovich, NH, CT - FINAL

Name and Office of Reviewer(s):  LA Luba Voronin (KC)

Source Language(s):  Russian, English

Target Language:  English

Source File Information

Files:  Audio file:  "190906_0016" – timestamps 0:01-3:00.

Participants: Special Agent Michael Morrison [SA]; Oleg Koshkin [Oleg]; Zurab [Interpreter].

VERBATIM TRANSLATION

UNCLASSIFIED//FOUO                                    **A1**

UNCLASSIFIED//FOUO

Acronyms:

[TN                                        Translator's note]

[PH                                              Phonetic]

[UI                                           Unintelligible]

[OV                                    Overlapping voices]

UNCLASSIFIED//FOUO                                        **A2**

UNCLASSIFIED//FOUO

[TN: In this translation document, English and Russian portions of the source audio are denoted in exegeses, vs. indicating the second language in *Italics*.]

[TN: In the Russian version of the FBI ADVICE OF RIGHTS form, the word Consent is translated as Refusal of Rights.]

UNCLASSIFIED//FOUO                                    **A3**

UNCLASSIFIED//FOUO

[verbatim translation begins]

[timestamp 0:02]

SA:         [English] [background noise] Special Agent Michael Morrison. I am here with
            Jessica Lapinsky uhm and…Zurab, I am sorry, I don't know [PH] your last
            name.

Interpreter:   [UI]

SA:         Here we go…with the FBI. We are here speaking with Oleg hmm about [PH] to
            advise him of his rights.  So it's currently nine six, twenty
            nineteen…[background noise] twenty nineteen…at uhm seven forty-one AM.
            Uhm you got a Russian version of this in front of you. I am just going to read
            the English version of the same, what I believe the same words [OV]

[timestamp 00:36]


[timestamp 00:36]

Interpreter:   --[Russian] That is [PH] in English [OV]

Oleg:        -- OK.

Interpreter:   --[Russian] English translation of the same.

[timestamp 00:38]


[timestamp 00:39]

SA:         [English] Uhm so, before we ask you any questions, you must understand your
            rights. Uhm  you have the right to remain silent. You do not have to talk to us
            right now if you don't want to. Uhm anything you say can be used against you
            in court. You have the right to talk to a lawyer for advice before we ask you any
            questions. You have the right to have a lawyer with you during the questioning.
            If you cannot afford a lawyer, one will be appointed uhm for you before any
            questioning if you wish. And if you decide to answer questions now without a
            lawyer present, you have the right to stop answering at any time. But if you want
            a chance right now to give us your side of the story, this is your opportunity. Is
            this what you would like? [OV]

[timestamp 01:13]


1
UNCLASSIFIED//FOUO                                                                    A4

UNCLASSIFIED//FOUO

[timestamp 01:14]

Interpreter:    [Russian] – That is [PH], do you understand your rights, correct? [OV]

Oleg:          -- Uh-huh [OV]

Interpreter:    [Russian] – Now it is an opportunity for you to express your opinion about what
                has been happening and what had been happening, to tell your version of the
                story.

[rustling sound]

[timestamp 01:30]


[timestamp 01:31]

SA:            [English] Do, do you want to talk to us now and answer questions and tell us
                about crypt4u?

[timestamp 01:35]


[timestamp 01:36]

Oleg:          [English] Okay, I can talk.

[timestamp 01:37]


[timestamp 01:38]

SA:            [English] Okay, but I just…want to ask you to sign your name there…that uh
                [OV]

[timestamp 01:42]


[timestamp 01:43]

Interpreter:    [Russian] Sign that, that you read it.

[timestamp 01:44]


[timestamp 01:45]

Oleg:          [Russian] But what does it mean refusal of rights?

2
UNCLASSIFIED//FOUO

**A5**

UNCLASSIFIED//FOUO

[background noise]
[timestamp 01:47]


[timestamp 01:48]
Interpreter:    [English] What does it mean re-refusal of right?
[timestamp 01:50]


[timestamp 01:51]
SA:            [English] Uhm, it should [OV]

Interpreter:   -- [UI] [OV]

SA:            [English] So it should say I read the statement of my rights and I understand
               what my rights are and at this time I am willing to answer questions without a
               lawyer present.
[timestamp 02:00]


[timestamp 02:01]
Interpreter:   [Russian] That is [OV]

SA:            [English] –This does not…

Interpreter:   [Russian] This, this is [English] wrong, wrong translation.

Interpreter:   [Russian] This means that your read your, your rights. You are not refusing.
               Nobody takes away your rights. It means your have read it. It is written here: I
               read my…my rights…

Oleg:          Uhm [OV]
[timestamp 02:16]

UNCLASSIFIED//FOUO

[timestamp 02:17]
SA:            -- [English] You, you don't give up your rights…[background noise] You can
                     stop talking at any time. [OV]

Interpreter:    --[English] [UI] time, if you want [PH]
[timestamp 02:19]


[timestamp 02:20]
Oleg:         -- [English] Uh-huh translate incorrect [PH]
[background noise]

Interpreter:    [Russian] Yes, [UI]
[background noise]
[timestamp 02:23]


[timestamp 02:24]
Interpreter:    UI [laughter]

[background noise]
[sighing]
[timestamp 02:30]


[timestamp 02:31]
[rustling sound]

SA:            [English] I'm just gonna [PH] copy the same date and time…

[sighing]

SA:            [English] Uhm and the time is seven forty-four… time [PH], witness, [rustling
                     sound]. And can you [PH] sign this [PH] for me please? [rustling sound]. Thank
                     you.

[background noise]

UNCLASSIFIED//FOUO

SA:          [English] So, I want to start with the… start with the basic.
[timestamp 03:00]

[verbatim translation ends]